**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **STANDING ROCK SIOUX TRIBE,** *et al.,* | |
| **Plaintiffs,** | |
| v. | **Civil Action No. 16-1534 (JEB)** |
| **U.S. ARMY CORPS OF ENGINEERS,** *et al.*, | |
| **Defendants.** | |

## MEMORANDUM OPINION

"Since the founding of this nation, the United States' relationship with the Indian tribes has been contentious and tragic. America's expansionist impulse in its formative years led to the removal and relocation of many tribes, often by treaty but also by force." Cobell v. Norton, 240 F.3d 1081, 1086 (D.C. Cir. 2001). This case also features what an American Indian tribe believes is an unlawful encroachment on its heritage. More specifically, the Standing Rock Sioux Tribe has sued the United States Army Corps of Engineers to block the operation of Corps permitting for the Dakota Access Pipeline (DAPL). The Tribe fears that construction of the pipeline, which runs within half a mile of its reservation in North and South Dakota, will destroy sites of cultural and historical significance. It has now filed a Motion for Preliminary Injunction, asserting principally that the Corps flouted its duty to engage in tribal consultations under the National Historic Preservation Act (NHPA) and that irreparable harm will ensue. After digging through a substantial record on an expedited basis, the Court cannot concur. It concludes that the Corps has likely complied with the NHPA and that the Tribe has not shown it will suffer injury

that would be prevented by any injunction the Court could issue.  The Motion will thus be denied.

## I.      Background

DAPL is a domestic oil pipeline designed to move over a half-billion gallons of crude oil across four states daily.  The oil enters the pipeline in North Dakota, crosses South Dakota and Iowa, and winds up in Patoka, Illinois, nearly 1,200 miles later.  Although the route does not actually cross the Standing Rock reservation, it runs within a half-mile of it.

A project of this magnitude often necessitates an extensive federal appraisal and permitting process.  Not so here.  Domestic oil pipelines, unlike natural-gas pipelines, require no general approval from the federal government.  In fact, DAPL needs almost no federal permitting of any kind because 99% of its route traverses private land.

One significant exception, however, concerns construction activities in federally regulated waters at hundreds of discrete places along the pipeline route.  The Corps needed to permit this activity under the Clean Water Act or the Rivers and Harbors Act – and sometimes both.  For DAPL, accordingly, it permitted these activities under a general permit known as Nationwide Permit 12.  The Tribe alleges that the Corps violated multiple federal statutes in doing so, including the National Environmental Policy Act (NEPA) and the National Historic Preservation Act (NHPA).  In its Complaint, the Tribe asserts that this DAPL permitting threatens its environmental and economic well-being, as well as its cultural resources.

Despite this broad lawsuit, however, the Standing Rock Sioux now seek a preliminary injunction only on the alleged violation of the NHPA.  That statute encompasses sites of cultural or religious significance to Indian tribes and requires that federal agencies consult with tribes prior to issuing permits that might affect these historic resources.  The Tribe claims that the

Corps did not fulfill this obligation before permitting the DAPL activities.  It bears noting that the Tribe does not press its environmental claims under NEPA here.  Nor does it seek a preliminary injunction to protect itself from the potential environmental harms that might arise from having the pipeline on its doorstep.  Instead, it asserts only that pipeline-construction activities – specifically, the grading and clearing of land – will cause irreparable injury to historic or cultural properties of great significance.

The statutes and permitting scheme involved in this Motion are undeniably complex.  The Court first sets forth the operation of the NHPA, which the Tribe asserts was violated.  It next explains the Clean Water Act and the Rivers and Harbors Act, under which the Corps permitted the DAPL activities.  Subsequent sections lay out the factual and legal proceedings that have taken place thus far.

A.  National Historic Preservation Act

Congress enacted the NHPA in 1966 to "foster conditions under which our modern society and our historic property can exist in productive harmony."  54 U.S.C. § 300101(1).  To this end, Section 106 of the Act requires a federal agency to consider the effect of its "undertakings" on property of historical significance, which includes property of cultural or religious significance to Indian tribes.  Id. §§ 306108, 302706(b).  An undertaking is defined broadly to include any "project, activity, or program" that requires a federal permit.  Id. § 300320.  Section 106, like the National Environmental Policy Act, is often described as a "stop, look, and listen" provision.  See Narragansett Indian Tribe v. Warwick Sewer Auth., 334 F.3d 161, 166 (1st Cir. 2003) (quoting Muckleshoot Indian Tribe v. U.S. Forest Serv., 177 F.3d 800, 805 (9th Cir. 1999) (per curiam)).  The agency must also give the Advisory Council on Historic Protection, which is charged with passing regulations to govern the implementation of

Section 106, "a reasonable opportunity to comment on the undertaking." 54 U.S.C. § 306108. The agency must further consult with, *inter alia*, tribes "that attach religious or cultural significance to [affected] property." Id. § 302706(b). Once this is done, Section 106 is satisfied. In other words, the provision does not mandate that the permitting agency take any particular preservation measures to protect these resources. See CTIA-Wireless Ass'n v. FCC, 466 F.3d 105, 106-07 (D.C. Cir. 2006) (citing Davis v. Latschar, 202 F.3d 359, 370 (D.C. Cir. 2000)).

The Advisory Council also promulgates the regulations necessary to implement Section 106, see 54 U.S.C. § 304108(a), and these regulations "command substantial judicial deference." McMillan Park Comm. v. Nat'l Capital Planning Comm'n, 968 F.2d 1283, 1288 (D.C. Cir. 1992). Under them, the permitting agency – here, the Corps – first determines "whether the proposed Federal action is an undertaking . . . and, if so, whether it is a type of activity that has the potential to cause effects on historic properties." 36 C.F.R. § 800.3(a). Where the agency decides either that there is no undertaking or that the undertaking is not the "type of activity" that has the "potential to cause effects on historic properties, assuming such . . . properties were present," the Section 106 process is complete. Id. § 800.3(a)(1). No consultation happens and the permit may issue. Id.

Things get more complicated where the agency cannot make this determination. In such a situation, the agency must complete a multi-step "consultation" process before it permits the undertaking. Id. § 800.16(f). Indian tribes that "attach religious and cultural significance to historic properties" that may be affected by the "undertaking" are a consulting party in this process even when the properties are located outside reservation lands. Id. § 800.2(a)(4), (c)(2)(ii). The regulations in fact instruct agencies to recognize that property of importance to Indian tribes is "frequently" located on "ancestral, aboriginal, or ceded lands." Id.

§ 800.2(c)(2)(ii)(D).  Once its interests are implicated, the affected tribe must be given a reasonable opportunity: "to identify its concerns about [these] properties"; to "advise on the identification and evaluation of" them; to "articulate its views on the undertaking's effects"; and to "participate in the resolution of adverse effects."  Id. § 800.2(c)(2)(ii)(A).  The agency is further directed to conduct these consultations "early in the planning process," id., in a "sensitive manner respectful of tribal sovereignty," and recognizing "the government-to-government relationship between the Federal Government and Indian tribes."  Id. § 800.2(c)(2)(ii)(B)-(C).

The regulations then put meat on these aspirational bones by laying out the step-by-step consultative process that must occur.  The process begins with initial planning, where the agency "determine[s] the appropriate SHPO . . . to be involved."  Id. § 800.3(c).  The State Historic Preservation Officer – viz., SHPO – is designated by the governor of the state to, inter alia, administer this national historic-preservation program at the state level.  In consultation with this Officer, an agency official then "identif[ies] any other parties entitled to be consulting parties and invite[s] them to participate."  Id. § 800.3(f).

Such parties then assist the agency to identify potential historic properties in the first phase.  The permitting official, along with the SHPO, initially "[d]etermine[s] and document[s] the area of potential effects," "[r]eview[s] existing information on historic properties within the area of potential effects," "[s]eek[s] information, as appropriate, from consulting parties," and "[g]ather[s] information from any [consulting] tribe . . . to assist in identifying properties" of potential significance to them.  Id. § 800.4(a).  Based on this information, the agency then "shall take the steps necessary to identify historic properties within the area of potential effects."  Id. § 800.4(b).  This identification effort extends to the "geographic area or areas within which an undertaking may directly or indirectly cause alterations in the character or use of historic

properties, if any such properties exist." Id. § 800.16(d) (defining "area[s] of potential effects"). The scope of this area is also "influenced by the scale and nature of an undertaking and may be different for different kinds of effects caused by the undertaking." Id. In this area, the official, through consultations, must "make a reasonable and good faith effort," "which may include background research, consultation, oral history interviews, sample field investigation, and field survey" to identify potential historic properties. Id. § 800.4(b)(1) (emphasis added). In deciding on the "[l]evel of effort" required, the official "take[s] into account past planning, research and studies, the magnitude and nature of the undertaking and the degree of Federal involvement, the nature and extent of potential effects on historic properties, and the likely nature and location of historic properties within the area of potential effects." Id.

Once the potentially relevant historic sites are identified, the official moves on to evaluating the historical significance of these sites in consultation with the SHPO and tribes. Id. § 800.4(c). This step must be taken in a manner that recognizes that the tribes "possess special expertise in assessing the eligibility of historic properties that may possess religious and cultural significance to them." Id. § 800.4(c)(1). Nevertheless, where the agency official and SHPO agree that an identified property should not be considered eligible for listing on the National Register of Historic Places, "the property shall be considered not eligible." Id. § 800.4(c)(2). The permitting agency may then decide at this stage "that either there are no historic properties present or there are historic properties present but the undertaking will have no effect upon them," document this finding, and notify all consulting parties. Id. § 800.4(d)(1). If neither the SHPO nor the Advisory Council (if it has entered the consultation) "object within 30 days of receipt of an adequately documented finding, the agency official's responsibilities under Section 106 are fulfilled." Id. § 800.4(d)(1)(i).

The agency otherwise proceeds to a third stage: assessment of the adverse effects on the identified historic properties.  Id. § 800.5(a).  An effect is considered adverse when the undertaking may "alter, directly or indirectly, any of the characteristics of a historic property that qualify it for inclusion in the National Register," including via the "introduction of visual, atmospheric or audible elements that diminish the integrity of the property's significant historic features."  Id. § 800.5(a)(1), (2)(v).  At this point, the agency may determine in consultation with the other parties that there is no qualifying adverse effect or impose modifications or conditions that lead to the same result.  Id. § 800.5(b).  Alternatively, the Section 106 process may proceed to a fourth and final stage involving resolution of the adverse effects in consultation with the other parties.  Id. § 800.6.  The agency may, however, terminate this final consultation if it becomes unproductive and then proceed to permit the undertaking despite the effects.  Id. § 800.7(a).

A few important global rules also apply to each stage of this process.  The permitting agency is empowered to "coordinate the steps of the Section 106 process, as appropriate, with the overall planning schedule for the undertaking and with any reviews required under" other statutes.  Id. § 800.3(b).  The agency may also "use the services of applicants [or] consultants" to prepare required "information, analyses, and recommendations" in making any of the various determinations.  Id. § 800.2(a)(3).  Finally, the regulations allow agencies to "develop procedures to implement Section 106 and substitute them" for its procedures where the Advisory Council determines "they are consistent with the Council's regulations."  Id. § 800.14(a).

B.  Clean Water Act

The CWA makes it unlawful to discharge dredged or fill material into navigable waters without a permit issued by the Corps.  See 33 U.S.C. §§ 1311(a), 1342(a).  The Corps grants this

approval in one of two ways: It issues individual permits for a specific action, id. § 1344(a), or it promulgates general permits that preauthorize a certain type of activity within a defined area. Id. § 1344(e)(1); see Sierra Club v. U.S. Army Corps of Eng'rs, 803 F.3d 31, 38-40 (D.C. Cir. 2015).

General permitting has obvious advantages over individual permitting. Most notably, general permits provide standing authority for an entire category of activities where those activities, alone and together, have minimal impact on regulated waters. See Sierra Club, 803 F.3d at 38-40; see also 33 U.S.C. § 1344(e)(1). They consequently eliminate the need for an arduous permit process for each minor action affecting a U.S. waterway. Indeed, a permittee may typically rely on the general permit without even notifying the Corps of its covered activity. See 33 C.F.R. § 330.1(e)(1). To keep things rolling, the Corps need only issue the permit through public notice and comment every five years. See 33 U.S.C. § 1344(e)(2).

But not every activity covered by a general permit receives this hands-off treatment. Actions proceeding under nationwide general permits also must comply with what are known as General Conditions. These GCs sometimes require that a particular covered action be subject to pre-construction notice and verification (PCN) by the Corps before the work begins. Where a discrete action requires a PCN, a Corps district engineer must confirm that the activity will comply with the general permit, cause no more than minimal adverse effects to the environment, and serve the public interest. See 33 C.F.R. §§ 330.1(e)(2)-(3), 330.6(a)(3)(i). In so doing, the district engineer may supplement the permit's basic rules with more project-specific ones or even

compel a more rigorous individual permitting process for that particular work.  Id. § 330.6(a)(2), (d).

The Corps here relies on one such general permit – Nationwide Permit 12 – to authorize "the construction, maintenance, repair, and removal" of pipelines throughout the nation, where the activity will affect no more than a half-acre of regulated waters at any single water crossing. See Reissuance of Nationwide Permits (NWP 12), 77 Fed Reg. 10,184, 10,271 (Feb. 12, 2012); see also Sierra Club, Inc. v. Bostick, 787 F.3d 1043, 1056 (10th Cir. 2015).  Each stand-alone crossing of a waterway is considered to be a "single and complete project" for these purposes. See 33 C.F.R. § 330.2(i).  Most pipeline work that involves minor activities in U.S. waters – i.e., affecting no more than half an acre – can thus proceed without any advance notice to the Corps.

Work that implicates tribal interests, however, cannot receive this *laissez-faire* handling. For example, GC 17 – not at issue here – prohibits the sanctioning of any activity under NWP 12 that will impair reserved tribal rights, including reserved water rights.  See NWP 12 at 10,283. Of more relevance, GC 20 mandates a PCN for any permitted activity that "may have the potential to cause effects to any historic properties . . . including previously unidentified properties" of cultural or religious importance to a tribe.  Id. at 10,284.  This includes activities that may cause only "visual or noise" effects to historic properties outside the project area or reserved tribal lands.  Id. at 10,251.  Before such an activity can proceed, a district engineer must verify either (1) that it will not actually affect any identified historic site or (2) that the tribal consultations required by the NHPA are complete.  Id. at 10,284.  And, should a sanctioned activity nevertheless stumble upon tribal artifacts or remains, GC 21 mandates that the permittee "immediately notify" the Corps and, to the maximum extent possible, halt "construction

activities that may affect" these objects until coordination with state, tribal, and federal authorities is complete.  Id.

NWP 12 also allows a district engineer to impose additional Regional Conditions where the district engineer deems the General Conditions insufficient to protect tribal interests.  See ECF No. 6, Exh. 1 (Decision Document for NWP 12) at 10; see also 33 C.F.R. § 330.5(b)(2)(ii). Many of these Regional Conditions restrict the scope of the Permit or expand the types of activities requiring a PCN process before an activity may proceed under it.  See, e.g., ECF No. 21, Exh. 3 (2012 NWP Regional Conditions for North Dakota).  Of particular relevance to this Motion, North Dakota's Regional Conditions require a PCN "prior to initiating any regulated activity in the Missouri River."  Id. at 1.  Permittees also must notify the Corps of "the location of any borrow site that will be used in conjunction with the construction of the authorized activity so that the Corps may evaluate the site for potential impacts to . . . historic properties." Id. at 2.

The Corps' more general permitting regulations further purport to assure that, in the "processing and evaluating of [any] permit," a district engineer give "maximum consideration [to] historic properties within the time and jurisdictional constraints of the Corps regulatory program."  33 C.F.R. pt. 325, app. C, § 2(f).  Appendix C of these regulations addresses the Corps' NHPA obligations and requires a district engineer to "take into account the effects, if any, of proposed undertakings on historic properties both within and beyond the waters of the U.S." Id. § 2(a).  The Corps considers each permitted water crossing of a linear pipeline, however, to be its own individual undertaking because the rest of the project – i.e., the entire line – "almost alway[s] can be undertaken without Corps authorization" of such individual crossing by a feasible reroute.  Id. § 1(g)(4)(i).  In other words, the Corps does not consider each crossing to be

the "but for" cause of the entire pipeline and thus does not consider the entire pipeline to be an undertaking.  Instead, the permitted undertaking, according to the Corps, "extend[s] in either direction from the crossing to that point at which alternative alignments leading to reasonable alternative locations for the crossing can be considered and evaluated."  Id. § 1(g)(4)(ii).  For these permitted actions, the district engineer must "encourage the consideration of historic properties at the earliest practical time in [a] planning process" and engage in consultations with tribal leaders, the Advisory Council on Historic Preservation, and State Historic Preservation Officers.  Id. § 2(e).  The regulations also specify when additional conditions should be placed on a permit to "avoid or reduce" effects to these properties.  Id. § 10(a).

       C.  Rivers and Harbors Act

The RHA forbids certain construction activities within the "navigable water of the United States" without prior permission from the Corps.  See 33 U.S.C. § 403.  The Corps often relies on NWP 12 to discharge this duty for pipeline construction having only a minimal impact on regulated waters, 33 C.F.R. § 322.3(a), and the same general CWA conditions apply here.  Lake Oahe is one of the waterways that falls under the jurisdiction of this Act.

* * *

To sum up, the NHPA requires that the Corps, prior to issuing a permit under the CWA or the RHA, consider the potential effect of that permitted activity on places of cultural or religious significance to Indian tribes.

       D.  Factual History

The Standing Rock Sioux Tribe is a federally recognized American Indian Tribe with a reservation spanning the border between North and South Dakota.  See ECF No. 1 (Complaint), ¶ 1.  The sweep of the Tribe's historic and cultural connection to the Great Plains, however,

11

extends beyond these modern reservation boundaries.  Id., ¶¶ 7-8.  A successor to the Great

Sioux Nation, the Tribe's ancestors once lived, loved, worshipped, and mourned "[w]herever the

buffalo roamed."  ECF No. 6-2 (Declaration of Jon Eagle, Sr.), ¶ 24.  These people created stone

alignments, burial cairns, and other rock features throughout the area to conduct important

spiritual rituals related to the rhythms of their daily life.  See ECF No. 14-1 (Declaration of Tim

Mentz, Sr.), ¶ 3; Eagle Decl., ¶¶ 20, 25.  Along the region's waterways in particular, the

prevalence of these artifacts reflects water's sacred role in their deeply held spiritual beliefs.  See

Eagle Decl., ¶ 25.  Today, the Standing Rock Sioux continue to honor these practices and cherish

the connection they have to their ancestors through these sites.  Id.

One place of particular significance to the Tribe lies at the traditional confluence of the

Missouri and Cannonball Rivers.  Id., ¶¶ 11-12; ECF No. 6-1 (Declaration of Dave Archambault

II), ¶ 12.  The ancestors to the Standing Rock Sioux gathered in this location to peacefully trade

with other tribes.  See Mentz Decl., ¶ 36.  They also considered the perfectly round stones

shaped by the meeting of these two great rivers to be sacred.  See Eagle Decl., ¶ 11.  Mighty

natural forces, however, no longer hone these stones.  Id.  In 1958, the Corps dredged and altered

the course of the Cannonball River to construct a dam.  Id.  As a result, a large man-made lake

known as Lake Oahe now covers the confluence.  Id.

The Tribe nevertheless continues to use the banks of the Missouri River for spiritual

ceremonies, and the River, as well as Lake Oahe, plays an integral role in the life and recreation

of those living on the reservation.  Id.  Naturally, then, the Tribe was troubled to learn in late

2014 that a new pipeline was being planned that would cross the Missouri River under Lake

Oahe about a half-mile north of the reservation.  See Archambault Decl., ¶¶ 8-12.  This was, of

course, DAPL – a 1,172-mile crude-oil pipeline poised to wind its way from the Bakken oil fields near Stanley, North Dakota, to refineries and terminals in Patoka, Illinois.

The conflict that has arisen since this revelation is, to say the least, factually complex. To ease digestion of the relevant information, the Court first describes how Dakota Access chose the pipeline route. It then lays out the facts surrounding the Corps' permitting and concurrent Section 106 process for the project. These following summaries admittedly contain significant detail and may try the reader's patience. The Court nonetheless believes such a narrative is necessary because a key question here is whether the Corps engaged in sufficient consultation with the Tribe under Section 106.

### 1.  *DAPL*

In the summer of 2014, Dakota Access crafted the route that brought DAPL to Standing Rock's doorstep. <u>See</u> ECF No. 22, Exh. B (Declaration of Monica Howard), ¶¶ 2-3. The plotted course almost exclusively tracked privately held lands and, in sensitive places like Lake Oahe, already-existing utility lines. As only 3% of the work needed to build the pipeline would ever require federal approval of any kind and only 1% of the pipeline was set to affect U.S. waterways, the pipeline could proceed largely on the company's timeline.

Dakota Access nevertheless also prominently considered another factor in crafting its route: the potential presence of historic properties. <u>Id.</u> Using past cultural surveys, the company devised DAPL's route to account for and avoid sites that had already been identified as potentially eligible for or listed on the National Register of Historic Places. <u>Id.</u>, ¶¶ 2-4. With that path in hand, in July 2014, the company purchased rights to a 400-foot corridor along its preliminary route to conduct extensive new cultural surveys of its own. <u>Id.</u>, ¶ 3. These surveys eventually covered the entire length of the pipeline in North and South Dakota, and much of

Iowa and Illinois.  Id., ¶ 8.  Professionally licensed archaeologists conducted Class II cultural surveys, which are "focused on visual reconnaissance of the ground surface in settings with high ground visibility."  Id.  In some places, however, the same archaeologists carried out more intensive Class III cultural surveys, which involve a "comprehensive archaeological survey program" requiring both surface visual inspection and shovel-test probes of fixed grids to "inventory, delineate, and assess" historic sites.  Id.  These latter surveys required coordination with and approval by State Historic Preservation Officers.  Id.

Where this surveying revealed previously unidentified historic or cultural resources that might be affected, the company mostly chose to reroute.  Id., ¶¶ 4-6.  In North Dakota, for example, the cultural surveys found 149 potentially eligible sites, 91 of which had stone features. Id., ¶ 5.  The pipeline workspace and route was modified to avoid all 91 of these stone features and all but 9 of the other potentially eligible sites.  Id.  By the time the company finally settled on a construction path, then, the pipeline route had been modified 140 times in North Dakota alone to avoid potential cultural resources.  Id., ¶ 6.  Plans had also been put in place to mitigate any effects on the other 9 sites through coordination with the North Dakota SHPO.  Id., ¶ 13.  All told, the company surveyed nearly twice as many miles in North Dakota as the 357 miles that would eventually be used for the pipeline.  Id., ¶ 12.

The company also opted to build its new pipeline along well-trodden ground wherever feasible.  See ECF No. 22-1 (Declaration of Joey Mahmoud), ¶¶ 18, 24, 40.  Around Lake Oahe, for example, the pipeline will track both the Northern Border Gas Pipeline, which was placed into service in 1982, and an existing overhead utility line.  Id., ¶ 18.  In fact, where it crosses Lake Oahe, DAPL is 100% adjacent to, and within 22 to 300 feet from, the existing pipeline.  Id. Dakota Access chose this route because these locations had "been disturbed in the past – both

above and below ground level – making it a 'brownfield crossing location.'"  <u>Id.</u>, ¶ 19.  This made it less likely, then, that new ground disturbances would harm intact cultural or tribal features.  <u>Id.</u>

Around the time the cultural survey work began, Dakota Access took its plan public.  <u>See</u> Howard Decl., ¶ 12.  On September 30, 2014, it met with the Standing Rock Sioux Tribal Council to present the pipeline project as part of a larger community-outreach effort.  <u>Id.</u>, ¶ 22. Personnel from Dakota Access also spoke with the Tribe's Historic Preservation Officer (THPO), Waste' Win Young, several times over the course of the next month.  <u>Id.</u>, ¶¶ 23-27.  At one related meeting, a DAPL archaeologist answered questions about the proposed survey work and invited input from Young on any areas that might be of particular tribal interest.  <u>Id.</u>, ¶¶ 25-28.  The company agreed as well to send the centerline files from its cultural survey to her for review, and did so on November 13.  <u>Id.</u>, ¶ 28.  It never received any response from Young.  <u>Id.</u>

### 2. *Entry of Corps*

Based on the current record, the Corps appears to have had little involvement in Dakota Access's early planning.  The one exception is a June 2014 meeting between the two parties to discuss the company's plan to build a pipeline through the region.  <u>See</u> ECF No. 21-18 (Declaration of Martha Chieply), ¶ 8.  At this meeting, the Corps informed the company about its permitting requirements and explained the importance of tribal coordination for any actions taken under its jurisdiction.  <u>Id.</u>  There is no indication that the company sought to secure any permitting or that it presented the Corps with a specific proposed route for DAPL at this time. <u>Id.</u>  This conclusion is consistent with the record evidence that Dakota Access was still buying up the necessary right-of-ways for the pipeline surveys in July 2014.  <u>See</u> Howard Decl., ¶ 3; Mahmoud Decl., ¶ 40.

The writing was on the wall, however, that many DAPL permitting requests would eventually land in the Corps inbox.  The Corps' Tribal Liaison, Joel Ames, accordingly, tried to set up a meeting with THPO Young beginning around September 17, 2014, without success.  See ECF No. 21-17 (Declaration of Joel Ames), ¶¶ 5-6; see also ECF No. 21, Exh. 9 (Corps Tribal Consultation Spreadsheet) at 1 (documenting five attempts by Ames to coordinate a meeting with Young in September 2014).  On October 2, other Corps personnel also sought to hold an arranged meeting with the Tribal Council and Dakota Access on the Standing Rock reservation. See Chieply Decl., ¶ 9.  But when the Corps timely arrived for the meeting, Tribal Chairman David Archambault told them that the conclave had started earlier than planned and had already ended.  Id.  Ames nevertheless continued to reach out to Young to try to schedule another meeting throughout the month of October.  See Ames Decl., ¶¶ 5-6.  When the new meeting was finally held at the reservation on November 6, though, DAPL was taken off the agenda because Young did not attend.  Id., ¶ 7.

3.  *Soil-Bore Testing at Lake Oahe*

The Corps' North Dakota office also received the first request for DAPL permitting around this time and launched a formal NHPA Section 106 consultation as a result.  See ECF No. 21-19 (Declaration of Richard Harnois), ¶ 5.  This solitary preconstruction request from Dakota Access sought permitting only to conduct preliminary soil-bore testing at the Lake Oahe site, not to actually begin any construction.  Id., ¶ 12.  Dakota Access needed to conduct these tests to determine whether it could subsequently use its preferred method of Horizontal Directional Drilling at the crossing.  Id.  HDD – which the company plans to use on all land subject to the RHA or owned by the Corps – allows for "construction across a sensitive area without excavation of a trench by installing the pipeline through a drilled hole significantly

below the conventional depth of a pipeline." Howard Decl., ¶ 7. This particular test involved drilling just seven holes of 4-inch diameter with an estimated 10 feet of impact on areas around the holes. See Harnois Decl., Exhs. 1-2. Access to and from the sites, moreover, would take place on existing roads. Id.

As a first cut, the Corps reviewed extensive existing cultural surveys both within and outside the Lake Oahe project area to determine whether the work might affect cultural resources. Id. Then, on October 24, the Corps sent out a letter to tribes, including the Standing Rock Sioux, with information about the proposed work and maps documenting the known cultural sites that the Corps had already identified. Id., ¶ 6; see id., Exh. 1. These included sites that the Corps considered to be outside the projected area of effect. Id., ¶ 6. In addition, the letter requested that any party interested in consulting on the matter reply within thirty days. Id. No response was received from the Tribe. Id. The Corps did receive responses from other tribes and the North Dakota SHPO, which it considered. Id., ¶ 7. After granting an extra three weeks for additional responses, on December 18 the Corps made an initial determination of "No Historic Properties Affected" for the soil-bore testing. Id., ¶¶ 7-11.

The Corps mailed out this decision in a Determination of Effect letter to the North Dakota SHPO and all affected tribes on the same day. Id., ¶ 11. The letter explained that the Corps had concluded that no historic properties would be affected by the tests and clarified that a previous "not eligible" determination had already been made for a nearby site that would also not be affected by the work. Id. The Corps also emailed Young again the next day to seek possible dates for a January 2015 meeting with the Tribe to discuss DAPL. See Tribal Consultation Sheet at 1 (documenting email on December 19, 2014). No response is in the record.

On February 12, 2015, having still heard nothing from the Tribe, Corps Senior Field Archaeologist Richard Harnois emailed Young again to solicit comments on the narrow issue of the soil-bore testing.  See Harnois Decl., ¶¶ 13-14.  Again, no reply.  Id.  Around this same time, Young informed the Corps' Tribal Liaison, Ames, at an unrelated regulatory meeting that she did not need to consult with the Corps at the moment as she was currently working directly with Dakota Access.  See Ames Decl., ¶ 8; see also Tribal Consultation Sheet at 1 (documenting contact).  As a result, on February 18, the Corps granted the PCN authorization under NWP 12 for the limited exploratory soil-bore testing requested by Dakota Access.  See Harnois Decl., ¶¶ 13-14.

At this point, the Court should note that the Tribe has not provided a declaration from Young about any of these early consultations (or lack thereof).  This omission is problematic for its cause because many of the facts relevant to the Tribe's NHPA claim involve her.  As a result, the rendition of the facts in the record is largely told through documentation and affidavits provided by the Corps, with the exception of letters from Young provided by the Tribe.

In any event, several weeks later, on March 2, 2015, the Corps finally received a letter from Young expressing concerns over sites that might be affected by the bore testing.  Id., ¶ 15.  The letter was dated on the same day that the Corps had green-lighted the work.  Id.  In particular, Young mentioned the North Cannonball Village Site, which was almost a half-mile from the closest "area of potential effect" boundary set by the Corps.  Id.  The letter further requested Class III and other cultural surveys under tribal monitoring before the testing, and tribal monitoring during both the testing and any later pipeline construction.  Id.  Young also sent a similar letter on February 25 to the Corps' Regulatory Branch Chief, Martha Chiefly.  See ECF No. 6, Exh. 6 (Letter from Young to Chiefly on Feb. 25, 2015).

Neither of these letters, contrary to representations made in the Tribe's Motion, appears to be an "immediate[]" response to a February invitation by the Corps to consult on PCNs related to the actual pipeline construction. <u>See</u> Mot. at 10; <u>see also</u> Letter from Young to Chieply (Feb. 25, 2015). Indeed, the letters make no mention of that February offer, focusing instead on the more narrow issue of the soil-bore testing. <u>See</u> Letter from Young to Chieply on Feb. 25, 2015. Of course, as the Court has explained, the Corps had already permitted that limited testing under NWP 12 by the time Young sent the letters. Ames nevertheless renewed his efforts to schedule a meeting between Chairman Archambault and the Corps' North Dakota District Commander, Colonel Henderson, in response to Young's letters, but the parties could not find a date when both men were available to consult. <u>See</u> Ames Decl., ¶ 9.

### 4. *PCN Authorizations*

In the meantime, Dakota Access initiated efforts on December 29, 2014, to secure five additional PCN authorizations under NWP 12 for pipeline-construction work in North Dakota. <u>See</u> Chieply Decl., ¶ 10. (Out of these, three were later withdrawn for various reasons. <u>Id.</u>) In the application, the company provided a project description, a water- and wetland-delineation report, and a cultural-survey report for areas around the PCN sites. <u>Id.</u>, Exh. 4 at 1, 8. Dakota Access also requested a jurisdictional determination from the Corps for the work. <u>Id.</u>, Exh. 4 at 1. On February 5, 2015, the Corps deemed the application incomplete and informed the company that it would require additional information before considering it. <u>Id.</u>, ¶ 11. At this time, the Corps also informed Dakota Access that one of the listed sites, PCN # 1, would not require Corps permitting because the involved waterway had previously been determined to be an isolated waterway not subject to the CWA or RHA. <u>Id.</u>, ¶¶ 10-11. Dakota Access responded with a complete application for the remaining PCNs on March 25. <u>See id.</u>, ¶ 13. The Corps,

accordingly, sent a letter in relation to an environmental assessment (EA) for the project to the Tribe and other parties on March 30.  See ECF No. 21-20 (Declaration of Jonathan Shelman), ¶ 7.  This letter described the two proposed crossings at Lake Sakakawea and the proposed crossing at Lake Oahe – *i.e.*, the three North Dakota sites still thought to require PCNs at the time – and solicited comments from the Tribe to be considered as part of the EA.  Id.

       While discussions between Dakota Access and the Corps were ongoing, the Corps also sent a form letter to Young on February 17, informing her that it was now considering 55 PCN requests across its offices for DAPL.  See ECF No. 6, Exh. 5.  The letter went on to explain that the majority of the pipeline work would occur in uplands that were not subject to Corps jurisdiction, but the Corps would need to permit crossings at the Missouri, James, Big Sioux, Des Moines, Mississippi, and Illinois Rivers.  Id.  The letter, moreover, noted that Dakota Access was conducting cultural surveys along the entire route.  Id.  Finally, the Corps requested that the Tribe let it "know if you have any knowledge or concerns regarding cultural resources . . . you would like the Corps to consider" and asked whether it wanted to consult on the project.  Id.  A response was requested prior to March 30 "to help facilitate a timely Section 106 review."  Id.  The Corps also attached the current proposed alignment provided by Dakota Access for the pipeline and contact information for various Corps staff involved in facilitating tribal consultations.  Id.

       On the date of the deadline to respond, Ames and Young exchanged emails, but the content of this exchange is not in the record.  See Tribal Consultation Sheet at 8.  Young did, however, formally respond on April 8.  See ECF No. 6, Exh. 7.  In her response this time, she acknowledged receipt of the Corps' February 17 letter about the 55 construction-related PCNs. Id. at 1.  But the thrust of her letter focused again on the Corps' failure to respond, prior to

permitting the soil-bore testing, to the concerns she had raised about that work.  See id. at 1-2.

She further expressed her belief that the Corps' inaction violated the Section 106 process.  Id. at

2.  She demanded that the Corps "clarify the proper sequencing of the Section 106 NHPA

process" before proceeding with the EA, asserted that she had not yet been contacted by Ames,

and described the placement of bore pits on private lands as an attempt to avoid federal

jurisdiction.  Id. at 2-3.  In conclusion, Young informed the Corps that the Tribe opposed "any

kind of oil pipeline construction through our ancestral lands," in part because the potential

dredging would take place where "human remains of relatives of current . . . tribal members"

were present.  Id. at 3.  Young ultimately closed, though, by reiterating that the Tribe "look[ed]

forward to participation in a full tribal consultation process" once it commenced.  Id.  On the

same day, Corps personnel and Standing Rock Archaeologist Dr. Kelly Morgan discussed future

pipeline realignments over the phone.  See Tribal Consultation Sheet at 7.

     5.  *Summer of 2015*

Relations between the Tribe and Corps did not improve in the summer of 2015.  Ames

attempted to speak with Young about the project in June, but she informed him via email that she

was on an extended leave of absence until July 27.  Id. at 8; see Ames Decl., ¶ 9.  Ames was

unable to determine whether anyone was empowered to act on the Tribe's behalf in her absence.

See Ames Decl., ¶ 9.  On July 22, Corps Operations Manager Eric Stasch also sent a letter to

Standing Rock describing the planned use of HDD for the Oahe crossing.  See Harnois Decl.,

¶ 16; see also id., Exh. 3.  In his letter, Stasch provided details about the areas of potential effects

and explained that the Corps would consider the work a federal undertaking despite its location

on private land.  See id., Exh. 3 at 1-2.  The letter went on to say that Dakota Access's cultural

surveys had identified an additional cultural site within the proposed preparation and staging area

for this work.  Id. at 2.  Finally, the letter requested a response within thirty days if the Tribe wished to consult on this particular crossing and indicated that consultations about other pipeline crossings would happen separately.  Id. at 2-3.  Attached to the letter were current and previous survey information, as well as general and detailed project maps illustrating the location and nature of the Lake Oahe crossing and recorded cultural resources.  See Harnois Decl., ¶ 16.

In August, the Tribe responded with two letters of its own.  See ECF No. 6, Exhs. 8 (Letter from Archambault to Cross on Aug. 19, 2015), 9 (Letter from Young to Stasch on Aug. 21, 2015).  The first, sent on August 19 from Chairman Archambault to Colonel Cross – the Corps' Commander and District Engineer for the Omaha District – described the Chairman's frustration in not being contacted earlier in regard to DAPL.  See Letter from Archambault to Cross (Aug. 19, 2015).  Archambault invited Cross to the reservation to discuss the matter and provided contact information for his administrative assistant to arrange the visit.  Id.  The very same day, Ames emailed Archambault's assistant in an attempt to schedule a meeting, but without success.  See Ames Decl., ¶ 10; see also Tribal Consultation Sheet at 8.  The second letter responded directly to Stasch's offer to consult on the Lake Oahe crossing.  See Letter from Young to Stasch (Aug. 21, 2015).  In it, Young again reiterated that the Section 106 consultation run by the Corps had failed to respond to concerns raised by the Tribe in their February letters about the soil-bore testing prior to the completion of that work.  Id.  She further expressed her frustration in being excluded from the Dakota Access surveying despite company promises to include tribal monitors, and she reiterated her concern that sites might be overlooked or damaged unless the Standing Rock Sioux participated in surveying.  Id.  In closing, Young again said the Tribe looked forward to participating in "future consultation prior to any work being completed . . . [and] to playing a primary role in any and all survey work and monitoring."  Id. at 2.

The Corps responded in at least three ways to the Tribe over the next month. First, on August 27, a Corps staff archaeologist started planning an onsite visit for the Corps, the Tribe, and the North Dakota SHPO to Lake Oahe. See Harnois Decl., ¶ 18. Second, the Corps' District Commander, Colonel Henderson, wrote back to Chairman Archambault. See ECF No. 6, Exh. 10 (Letter from Henderson to Archambault on Sept. 3, 2015). Most of Henderson's letter reiterated the form offer to consult and other general project information, but the letter also acknowledged receipt of the Tribe's recent letters and provided additional information about the requested PCN locations. Id. at 2. Third, Stasch sent a letter on September 16, expressing his willingness and desire to address the Tribe's questions and concerns during the upcoming onsite visit to Lake Oahe planned by the Corps. See Harnois Decl., ¶ 22.

On the same day as Stasch's letter, Harnois also emailed Standing Rock Archaeologist Morgan to invite her to participate in the "working level, on-the-ground site visit of the proposed DAPL Oahe Crossing." Id., ¶ 23. This sparked an email exchange between the two on logistics and dates. Id. The very next day, however, Morgan emailed the Corps to back out of the visit. Id., Exh. 4. In an attached letter, she explained that "after careful consideration the [Standing Rock] THPO has determined that it is in the best interest of the THPO to decline participation in the site visits and walking the project corridor's [area of projected effects] at this time until government-to-government consultation has occurred for this project per Section 106 requirements as requested by the Standing Rock Sioux Tribe." Id. By this she seemed to mean that the Corps needed to first hold the previously requested meeting between Chairman Archambault and Colonel Henderson. Id. Despite the Tribe's withdrawal, the Corps ultimately proceeded to hold the onsite visit with the North Dakota SHPO. See Harnois Decl., ¶ 26.

23

About a week later, the Tribe sent another letter, this time from Young to Colonel Henderson.  <u>See</u> ECF No. 6, Exh. 11 (Letter from Young to Henderson on Sept. 28, 2015).  In this letter, Young noted her concern "about the lack of consultation prior to the start of archaeological surveys."  <u>Id.</u> at 1.  She further indicated that the Tribe had "received no correspondence prior to the soil bore hole testing," which she then characterized as evidence that "the Corps is attempting to circumvent the Section 106 process."  <u>Id.</u>  Citing the potential for "irreparable damage to . . . known sites," she complained about the Tribe's "exclusion of tribal participation up to this point" from the identification efforts and Section 106 process.  <u>Id.</u>  In addition, she indicated that the Tribe believed "the entire length of the DAPL [is] one project under the . . . [RHA], as well as" the CWA, and that the Corps was trying to avoid "federalization."  <u>Id.</u> at 2.

> 6.  *Fall of 2015*

In the fall, the Corps responded by redoubling its efforts to meet with the Tribe.  On September 29, 2015, Ames, in a phone conversation with Chairman Archambault, scheduled a meeting between the Corps and the Tribe's Vice Chair for October 28.  <u>See</u> Ames Decl., ¶ 13.  But two days before that meeting, the Tribe canceled "because nobody from the tribe was available to attend."  <u>Id.</u>  On the same day, the Tribe also canceled a meeting scheduled for November with Colonel Henderson, promising to meet with him instead "in a few months."  <u>Id.</u>, ¶ 14.  The Corps, moreover, documented ten different attempts to contact the Tribe over the course of the October to speak about the project.  <u>See</u> Tribal Consultation Sheet at 14.

Then, in November, the Corps twice invited the Tribe to a general tribal meeting in Sioux Falls, South Dakota, scheduled for December 8 to 9.  <u>See</u> Chieply Decl., ¶ 17<u>; see also</u> <u>id.</u>, Exh. 10.  This invitation contained a link to the cultural surveys provided by Dakota Access.  <u>Id.</u>  Five

tribes attended this meeting.  Id., ¶ 18.  Standing Rock did not.  Id.  At the meeting, the Corps

made sure that the tribes had copies of the cultural surveys, and the group agreed to reconvene on

January 25, 2016, to discuss any issues they found with those surveys.  Id.  Around the time of

this meeting, the Corps also independently looked through these cultural surveys and other route

maps to determine whether any additional DAPL crossings might have the potential to affect

historic properties.  See ECF No. 21-18, Exh. 16.  The Corps concluded that only the James

River crossing (PCN #4) raised any concerns; no others triggered the need for a PCN under

General Condition 20.  Id.

During this tribal gathering, Morgan sent a letter to the Corps, indicating that the Tribe

was "still interested in formal consultation on the proposed" pipeline despite its decision not to

attend.  See ECF No. 6, Exh. 12 (Letter from Morgan to Chiefly on Dec. 8, 2015) at 1.  The

Tribe yet again noted that it had not received a response from the Corps about the concerns it had

raised in regard to the bore testing.  Id.  Morgan also protested that the testing should not proceed

prior to mitigation efforts and indicated that the Tribe did not concur in the "no effects"

determination for this work.  Id. at 2.  This, of course, makes little sense given that Young had

already acknowledged in previous letters from the Tribe that they were aware the soil-bore

testing had already taken place back in the spring.  See, e.g., Letter from Young to Henderson on

Sept. 28, 2015 (recognizing "soil bore testing has already occurred despite our initial

correspondence").  In any event, Morgan further indicated that the Tribe looked forward to

playing a primary role in any surveying or monitoring and explained that it would refuse to

participate in tribal meetings until Colonel Henderson came to their reservation to meet with

them first.  Letter from Morgan to Chiefly (Dec. 8, 2015) at 1.  Finally, she informed the Corps

that the Tribe thought the draft EA could not be issued prior to a full cultural-resources survey. Id. at 2.

Again, the Corps appears to have taken action in response to the Tribe's demands. Henderson ordered Omaha District Deputy Commander, Lieutenant Colonel Michael D. Sexton to attempt to schedule a meeting with Plaintiff for him. See Ames Decl., ¶ 17. He did so in response to the setbacks experienced by Ames in attempting to secure the same over the previous months. Id. The Tribe, however, never returned Sexton's calls about scheduling a meeting either, and Young subsequently left her position with the Standing Rock Sioux. Id.

On December 8, the Corps released a draft EA for the project, which contained a request for comment by January 8, 2016. See Shelman Decl., ¶ 8. In the portion of the EA describing the Section 106 process, the draft explained that consultations began in November 2014 for initial geotechnical explorations, which then closed in January 2015. See ECF No. 6, Exh. 13 (Draft EA, Nov. 2015) at 58. The draft next described the ongoing process, starting in July 2015, for consultation related to the actual pipeline construction. Id. In so doing, it acknowledged the Corps' failure to secure onsite visits or government-to-government meetings to date. Id. at 58-59. In the very next section, the EA indicated that Young had said in the October 2014 meeting with Dakota Access that the Lake Oahe HDD process "appeared to avoid impacts to known sites of tribal significance." Id. at 59.

### 7. *2016*

The Tribe provided timely and extensive comments to the draft EA in letters on January 8 and March 24, 2016. See ECF No. 6, Exh. 14 (Standing Rock Comments on Draft EA); id., Exh. 15 (Standing Rock Supplemental Comments). In these comments, Archambault asserted that the Corps had failed to consult on the identification of cultural sites important to the Tribe. See

Standing Rock Comments on Draft EA at 2-3; see also id. at 4 (asserting Corps violated its own policy to hold "an active and respectful dialogue. . . before decisions are made and actions are taken"); id. (claiming bore testing violated NHPA because Corps did not include Tribe in decisionmaking process); id. at 6 (noting Corps reliance on old surveys conducted before 1992 Amendments to NHPA).  He explained the importance of such consultations by, in part, describing tribal "oral traditions and historical records" that recorded the presence of known sites and burials in the direct path of the pipeline.  Id. (counting "at least 350 known sites within the project corridor in North Dakota alone"); see also id. at 4 (indicating that Draft EA misrepresented Tribe's position in October 2014 meeting thanks to false impression from Dakota Access).  As a result, he concluded that those outside the Tribe could not properly identify these sites.  Id.  He additionally criticized the 400-foot corridor used for the Dakota Access surveys as too narrow and described the "no effects" determination by the Corps for sites within the corridor as lacking "scientific or engineering support."  Id. at 7-8.  Archambault, in his later supplemental comments, again stressed the importance of tribal participation in the identification of historic properties and, accordingly, decisions about potential alternative routes for the pipeline.  See Standing Rock Supplemental Comments at 23-24.  He also cited the Advisory Council's Section 106 regulations and case law to support his assertion that form letters and public meetings could not meet the Corps' obligations under the NHPA to consult with the tribes.  Id.  In conclusion, he implored the Corps to assure that full cultural surveys would be done, with tribal input, on the entire pipeline.  Id. at 28-29.  Two other tribes also indicated at this time that they thought they had not yet been fully consulted on the potential effects of the pipeline.  See ECF No. 6, Exhs. 22-24.

The Section 106 process between the Corps and Tribe finally picked up steam in the spring of 2016. From January to May, there were no fewer than seven meetings between the two entities. On January 22, Corps Senior Archaeologist Harnois met at the reservation with Chairman Archambault; the Tribe's new THPO Ron His Horse is Thunder; Morgan; and the Tribe's Section 106 Coordinator, LaDonna Brave Bull Allard. See Harnois Decl., ¶ 27. Three days later, on January 25, the Tribe participated in the follow-on tribal meeting to discuss the Dakota Access cultural surveys. See Chieply Decl., ¶ 21. Next, on March 3, Corps staff held a meeting with the Tribe at Corps headquarters. See Ames Decl., ¶ 29. Perhaps most significantly, Morgan met with the Corps to express specific concerns about tribal burial sites at the James River crossing (PCN # 4). See Harnois Decl., ¶ 24. Based on the information she provided, the Corps verified the presence of cultural resources at the site and successfully instructed Dakota Access to move the pipeline alignment to avoid them. Id.

Colonel Henderson also attended several meetings with the Tribe. He first officiated at a third tribal summit on February 18-19, again with Standing Rock participation. See Chieply Decl., ¶ 22. Then, he attended meetings with Standing Rock on February 26, April 29, and May 14. See Ames Decl., ¶¶ 26, 33, 36. Through these conversations, Henderson committed the Corps to imposing several additional conditions on DAPL, such as double-walled piping, in response to tribal concerns about environmental safety. Id., ¶ 27. One of these summits also included an onsite visit to the Lake Oahe crossing. See Harnois Decl., ¶ 28; see also Archambault Decl., ¶ 19. During that visit, Chairman Archambault "pointed out areas of concern and explained the tribe's issues with the pipeline project." Harnois Decl., ¶ 28. Indeed, in March, Archambault acknowledged that the Corps had recently made strides toward righting the Section 106 ship and indicated he felt this particular onsite visit was productive at identifying

new stones, graves, burial sites, and earthen lodges that needed to be considered by the Corps. See Supplemental Comments on Draft EA at 26-27. Henderson and Archambault exchanged letters about the project throughout the spring as well. Id., ¶ 30.

The improved relationship, however, had its limits. In the spring, the Corps worked with Dakota Access to offer consulting tribes an opportunity to conduct cultural surveys at PCN locations where the private landowner would permit them. See Chiefly Decl., ¶ 28. This included 7 of the 11 sites in North and South Dakota. Id. Three tribes took the opportunity, and it paid off. See ECF No. 22, Exh. C (Declaration of Michelle Dippel) ¶ 28. The Upper Sioux Community identified areas of tribal concern at three PCN sites, and Dakota Access agreed to additional avoidance measures at all of them. Id. At one of these sites, the tribal surveyors and the Iowa SHPO declared a site eligible for listing on the National Registry that had not previously been identified on Dakota Access's surveys. See Eagle Decl., ¶¶ 32-36; see also Mentz Decl., ¶¶ 38-39 (describing his hiring to conduct surveys for the Upper Sioux). Dakota Access agreed in response to this discovery to bury the pipeline 111 feet below the site to avoid disturbing it. See Mot. Hearing Trans. at 36. Similarly, the Osage Tribe identified areas through their surveys that they wished to monitor during construction, and the company granted that request too. Id.

Standing Rock took a different tack. The Tribe declined to participate in the surveys because of their limited scope. See Chiefly Decl., ¶ 29. Instead, it urged the Corps to redefine the area of potential effect to include the entire pipeline and asserted that it would send no experts to help identify cultural resources until this occurred. Id. In a responsive email, the Corps expressed its regret that the Tribe would not participate and welcomed any knowledge or information regarding historic properties that it was still willing to provide. Id. The Corps went

on to explain that it did not "regulate or oversee the construction of pipelines, and [its] regulatory control is limited to only a small portion of the land and waterways that the pipeline traverses." Id., Exh. 14.  While the Corps' regulations allowed it to consider uplands outside "waters of the United States," the email asserted that work in these areas had to be "directly associated [with], integrally related [to]," and caused by the "in-water authorized activity" before the Corps could claim authority over it.  Id.

The Tribe did engage in two more visits to Lake Oahe with the Corps around this time. See Eagle Decl., ¶¶ 13-14; Harnois Decl., ¶ 29.  First, on March 8, Morgan and the Tribe's latest THPO, Jon Eagle, identified areas of potential cultural significance to the Corps and described the area's sacred importance to the Standing Rock people.  See Harnois Decl., ¶ 29.  Several of the sites they identified were in areas that the Corps had determined were well outside the area of potential impact for the project, such as a cemetery approximately 1.2 miles from the nearest bore pit and .6 miles from the HDD preparation and construction area.  Id.  The group also toured the Cannonball Village site.  Id.  At this site, Morgan and Eagle pointed out places in the mole dirt where "pottery shards, pieces of bone, flint and tools used for scraping hides and cutting" were visible.  See Eagle Decl., ¶ 14.  Eagle, in addition, pointed out a sacred stone in the area that is still used for prayer.  Id., ¶ 15.  During the visit, Corps staff acknowledged that they had been previously unaware of some of these cultural resources and committed to further study of them.  Id., ¶ 14.  Morgan and Harnois thereafter exchanged several follow-up emails to discuss the Tribe's "concerns and questions" generated by the onsite visit.  See Harnois Decl., ¶¶ 30-31.  The Corps nevertheless ultimately determined that the Cannonball Village site was not in the area that would be affected by DAPL-related construction work.  Id., ¶ 29.

The second onsite visit occurred on March 22 and went much the same as the first.  Id.,
¶ 32.  This time, however, Morgan asked questions about the surveying that had been done on
the area as part of the Northern Borderline Pipeline project – a pre-existing natural-gas pipeline
installed under Lake Oahe that runs parallel to DAPL's proposed course.  Id.  Harnois continued
discussions with her about the adequacy of the mapping and considered requiring additional
testing on the site.  Id.  Ultimately, however, Harnois determined that additional testing would
not be necessary based on his later review of the site documentation and research.  Id.

The Corps then sought to end the Section 106 process for the Lake Oahe crossing.  On
April 22, Harnois made a Determination of Effect for the site and emailed it to the consulting
parties.  Id., ¶ 33; see also ECF No. 6, Exh. 43.  In it, Harnois described the project, explained
the location, and discussed data on 41 potential historic sites in detail.  Id.  He concluded that one
of the sites identified, 32MOx0570, was "not eligible" for listing and that the project overall had
"no historic properties subject to effect."  Id.  Four days later, the North Dakota SHPO concurred
with his determination via email.  See Harnois Decl., ¶ 34.  Harnois then notified the Tribe of
this concurrence.  Id., ¶ 35.  Both Chairman Archambault and Eagle formally objected to the
determination.  See ECF No. 6, Exh. 30 at 2 ("To date, none of our request for consultation or
Class III Cultural Surveys has been honored."); id., Exh. 31.  As a result, the Tribe and Corps
continued their dialogue on these issues.  See Ames Decl., ¶ 36; Chiefly Decl., ¶¶ 32, 35
(describing Corps response to these objections).

The Advisory Council – the agency responsible for commenting on NHPA compliance
for federal undertakings – also sent the Corps a series of letters about the adequacy of the Section
106 process around this time.  After the Corps published the draft EA, the Advisory Council
requested verification from the Corps of its consultation efforts and relayed concerns expressed

to them by Archambault about the consultations (or lack thereof) that had occurred to date with Standing Rock.  See ECF No. 6, Exh. 20 (Advisory Council Comment on Draft EA) at 2.  The Advisory Council formally entered the Section 106 consultation process for DAPL soon thereafter.  See Chiefly Decl., ¶ 27.  Then, in March, the Advisory Council wrote to express its skepticism about the Corps' determination that the entire pipeline was not subject to its jurisdiction.  See ECF No. 6, Exh. 25 (Letter from Advisory Council to Henderson on Mar. 15, 2016).  In particular, the Advisory Council felt that the PCNs required for various portions of the pipeline transformed the entire pipeline into an undertaking.  Id.  In addition, the Advisory Council described itself as "perplexed by the Corps' apparent difficulties in consulting" with Standing Rock.  Id.  Again, on May 6, the Advisory Council wrote with additional questions relating to the DAPL permit area, tribal consultations, and federal-agency coordination.  See ECF No. 6, Exh. 26.  The Advisory Council also formally objected to the Corps determination of "no effects," citing numerous deficiencies in the Section 106 process, including the failure of the Corps to properly define the scope of its responsibilities.  See ECF No. 6, Exh. 32.  Finally, on June 2, the Advisory Council requested that the Assistant Secretary of the Army for Civil Works, Jo-Ellen Darcy, review that "no effects" determination.  See Chiefly Decl., ¶ 32.

The Corps responded to these letters with several of its own.  On May 13, Henderson wrote to reiterate that the Corps could not exercise control over portions of the project not subject to its jurisdiction.  See id.; see also id., Exh. 15.  In his letter, Henderson contested the Advisory Council's conclusion that the permitted activity determined the entire right-of-way for the pipeline, instead contending that the crossing of jurisdictional waters did not ultimately control project alignment elsewhere.  Id.  He further explained that the use of HDD in many places would avoid Corps jurisdiction altogether by eliminating any discharge of dredge or fill

materials into regulated waters.  Id.  On June 30, the Assistant Secretary of the Army also

replied.  See Chieply Decl, ¶ 38; see also ECF No. 6, Exh. 39.  In her letter, she reiterated the

Corps' position on its own jurisdiction, asserted tribes were notified and invited to participate

and provide information, and contested the Advisory Council's claim that field visits had

identified the presence of new areas within the APE for the project.  Id.

The Corps then moved to close the book on the matter.  On July 25, 2016, it issued an EA

finding of "no significant impact" and verified all 204 PCN locations under NWP 12.  See ECF

No. 6, Exhs. 33-36; Ames Decl., ¶ 36.  The PCNs, however, contained additional restrictions.

See ECF No. 6, Exhs. 33-36.  Most importantly, they instituted a "Tribal Monitoring Plan" that

requires Dakota Access to allow tribal monitors at all PCN sites when construction is occurring.

Id.  Dakota Access immediately notified the tribes of its intent to begin construction at the PCN

sites within five to seven days.  See ECF No. 6, Exh. 49 (Letter from Dippel to Upper Sioux).

* * *

In summary, the Corps has documented dozens of attempts it made to consult with the

Standing Rock Sioux from the fall of 2014 through the spring of 2016 on the permitted DAPL

activities.  These included at least three site visits to the Lake Oahe crossing to assess any

potential effects on historic properties and four meetings with Colonel Henderson.

E.  Procedural History and Recent Activities

Two days after the Corps issued the PCN authorizations, Standing Rock filed this suit

against it under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*, asserting in part that

the Corps had violated its obligation under the NHPA prior to issuing the permitting for DAPL-

related construction along the entire pipeline route.  The Tribe then filed, on August 4, 2016, this

Motion for Preliminary Injunction to mandate a withdrawal of this permitting.  The next day,

Dakota Access intervened in the action in support of the Corps. See ECF No. 7 (Dakota Access Motion to Intervene). The Court subsequently permitted intervention by the Cheyenne River Sioux Tribe on Plaintiff's side, though it did not participate in this Motion. After a scheduling conference on August 8, the Court ordered an expedited briefing schedule and set a hearing on the Motion for August 24.

At the Motion hearing, Dakota Access revealed that most of the construction associated with DAPL is, in fact, already complete. Because only 3% of the pipeline is subject to federal permitting, Dakota Access has always been free to proceed with the vast majority of the construction, which will occur on private land. In fact, 48% of the pipeline had already been cleared, graded, trenched, piped, backfilled, and reclaimed. See Mot. Hearing Trans. at 24. The company also moved fast elsewhere; this figure included all but 11 of the 204 sites that the Corps had subjected to PCN authorization. Id. at 25. All of the necessary clearing and grading has also been done in South Dakota, and 90% of it is complete in North Dakota. Id. at 24. One of the few exceptions is the crossing leading up to the west side of Lake Oahe, which has not yet been cleared or graded.

The tribal monitoring and GC 21 unexpected-discovery protocols also appeared to be in place for the activity that was permitted by the Corps. Id. at 37-39. When construction is ongoing for such activities, Dakota Access allows archaeological and tribal monitors onsite to look for evidence of cultural or historic resources. Id. As of the hearing, construction had triggered the unexpected-discovery protocol six times. Id. at 39. In each case, construction stopped until the state, federal, and tribal representatives confirmed that the resources were not being damaged. Id. Each one turned out to be a false alarm. Id. At the conclusion of the hearing, the Court informed the parties that it would issue its decision on September 9, two

weeks being necessary to adequately review the voluminous record and draft this lengthy Opinion.

Nine days after the hearing, on Friday, September 2, the Tribe filed a supplemental declaration by Tim Mentz, the Tribe's former Tribal Historic Preservation Officer and a member of the Standing Rock Sioux Tribe.  See ECF No. 29-1 (Supplemental Declaration of Tim Mentz, Sr.).  In the declaration, Mentz explained that he had been invited by a landowner to conduct cultural surveys on private land along the DAPL route that had already been cleared for pipeline construction.  See id., ¶¶ 2-3; see also id., Exh. 1.  This land was about 1.75 miles from the construction activity that the Corps has actually permitted at Lake Oahe.  Id., ¶ 3.  In other words, the area in question was entirely outside the Corps' jurisdiction.  The construction activity on it, as a result, never required a federal permit, and neither the Corps nor any other federal agency had any control over it.  Because these activities do not require a federal permit, they are also not necessarily subject to the attendant restrictions to protect historic properties – i.e., GC 21 and tribal monitoring – placed by the Corps on the activities that it did permit.

Mentz, over the course of several days beginning on August 30, avers that he surveyed this private land around the pipeline right-of-way.  Id., ¶ 6.  During these surveys, he observed several rock cairns and other sites of cultural significance inside the 150-foot corridor staked for DAPL construction.  Id., ¶¶ 7-11.  He was, however, confined in his actual surveying to those areas immediately adjacent to the pipeline right-of-way and did not enter the corridor itself. Id.  Mentz documented the presence of several sites that he believed to be of great cultural note nearby, including a stone constellation used to mark the burial site of a very important tribal leader about 75 feet from the pipeline corridor.  Id., ¶ 10.  Mentz did not observe any fencing or other protective measures around these sites.  Id., ¶ 9.  He also observed what he believed to be

important stone features within the pipeline corridor.  Id., ¶ 11.  According to Mentz, none of these sites was documented on the earlier cultural surveys of the area commissioned by Dakota Access.  Id., ¶ 17.

The next day, on Saturday, September 3, Dakota Access graded this area.  See ECF No. 30 (Emergency Motion for Temporary Restraining Order).  On September 4, both the Tribe and the Cheyenne River Sioux Tribe filed for a Temporary Restraining Order on any additional construction work at the site described by Mentz – i.e., the length of the pipeline route for approximately two miles west of Highway 1806 in North Dakota – and for any additional construction work on the pipeline within 20 miles on either side of Lake Oahe, until the Court ruled on this Motion for Preliminary Injunction.  Id.  The Corps responded that it would not oppose the restraining order while awaiting this decision.

Dakota Access, not surprisingly, hotly contested Mentz's version of events in its opposition to the TRO motion.  In a map of the area, the company sought to demonstrate that many of the sites documented by Mentz were in fact well outside the pipeline route.  See ECF No. 34 (Response to TRO) at 6-8.  The rest, according to Dakota Access, were directly over the existing Northern Border Natural Gas Pipeline that runs through the area and thus could not have been historic artifacts.  Id. at 6.  The company instead alleges that the route of the pipeline in this area proves its point: it twists and turns to avoid the finds that Mentz documented adjacent to the pipeline and thus demonstrates that Dakota Access did purposefully shift the route to avoid any sites of cultural significance in its planning phase.  Id.  The Court acknowledges that the map provided by the company does seem to indicate that the pipeline curves to accommodate the cultural sites.  Id. at 7.

This Court held a TRO hearing on September 6, the first business day after that motion was filed.  Without making factual determinations about the truth of Mentz's observations, the Court was able to obtain Dakota Access's agreement not to perform any construction activities within 20 miles east of Lake Oahe and within about two miles west of the Lake, as it had already ceased such operations while awaiting the Court's preliminary-injunction ruling.  The Court otherwise denied the TRO.  This current Opinion now issues on a highly expedited basis.

## II.    Legal Standard

"[I]njunctive relief" is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  Winter v. Nat. Res. Def. Advisory Council, Inc., 555 U.S. 7, 22 (2008).  "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."  Id. at 20.  Before the Supreme Court's decision in Winter, courts weighed the preliminary-injunction factors on a sliding scale, allowing a weak showing on one factor to be overcome by a strong showing on another factor.  See, e.g., Davenport v. Int'l Bhd. of Teamsters, 166 F.3d 356, 360-61 (D.C. Cir. 1999).  This Circuit, however, has suggested, without deciding, that Winter should be read to abandon the sliding-scale analysis in favor of a "more demanding burden" requiring plaintiffs to independently demonstrate both a likelihood of success on the merits and irreparable harm.  See Sherley v. Sebelius, 644 F.3d 388, 392-93 (D.C. Cir. 2011); Davis v. Pension Benefit Guar. Corp., 571 F.3d 1288, 1292 (D.C. Cir. 2009).

Whether a sliding-scale analysis still exists or not, courts in our Circuit have held that "if a party makes no showing of irreparable injury, the court may deny the motion for injunctive relief without considering the other factors."  Dodd v. Fleming, 223 F. Supp. 2d 15, 20 (D.D.C.

2002) (citing <u>CityFed Fin. Corp. v. Office of Thrift Supervision</u>, 58 F.3d 738, 747 (D.C. Cir.

1995)).  Likewise, a failure to show a likelihood of success on the merits alone is sufficient to

defeat a preliminary-injunction motion.  <u>Ark. Dairy Co-op Ass'n, Inc. v. USDA</u>, 573 F.3d 815,

832 (D.C. Cir. 2009) (citing <u>Apotex, Inc. v. FDA</u>, 449 F.3d 1249, 1253 (D.C. Cir. 2006)).  It

follows, then, that the Court may deny a motion for preliminary injunction, without further

inquiry, upon finding that a plaintiff is unable to show <u>either</u> irreparable injury or a likelihood of

success on the merits.  Here, Standing Rock fails on both grounds.

## III.    Analysis

The Corps gave the go-ahead, under NWP 12, for DAPL's construction activities in

federally regulated waters at hundreds of discrete places along its nearly 1,200-mile route.  In

seeking a preliminary injunction, the Tribe contends that the Corps, in doing so, shirked its

responsibility to first engage in the tribal consultations required by the NHPA.  Because DAPL

construction is ongoing, the Tribe further asserts that sites of great significance will likely be

damaged or destroyed unless this Court pumps the brakes now.  It also contends that the balance

of harms and the public interest favor its position.

Defendants rejoin that preliminary-injunctive relief is inappropriate both because the

Corps has satisfied its obligations under the NHPA – in other words, the Tribe is unlikely to

succeed on the merits of its NHPA claim – and because the Tribe has failed to show that any

harm will befall it in the absence of an injunction.  As the Court agrees on both points, it need

not consider the final two factors – balance of harms and the public interest – to deny the

Motion.  It now discusses the merits and the harm separately.

A.  <u>Likelihood of Success on the Merits</u>

Although the Tribe's legal theory is not entirely clear, the Court believes it can infer four separate arguments that the Corps' permitting of DAPL was unlawful.  First, the Standing Rock Sioux assert that the Corps violated the NHPA when it promulgated NWP 12 without a Section 106 process.  Next, they contend that, even if the Corps could defer site-specific Section 106 consultations when promulgating NWP 12, it violated the NHPA by permitting DAPL-related activities at some federally regulated waters without a Section 106 determination.  Third, the Tribe maintains that, even where the Corps did conduct a Section 106 process, it unlawfully narrowed the scope of its review to only those areas around the permitted activity, as opposed to the entire pipeline.  Finally, the Tribe urges that the Section 106 process at the PCN sites was inadequate because the quality of the consultations was deficient.  None of these claims appears likely to succeed on the merits at this stage.

*1.  NWP 12*

Although many DAPL-related construction activities in federally regulated waters occurred or will occur at places where the Corps did not require a PCN verification, such activities nevertheless required approval from the Corps under the CWA or RHA.  That approval was provided on a general level when the Corps re-promulgated NWP 12 in 2012.  Because these activities thus were "permitted" by a federal agency, they fall within the NHPA's definition of a federal "undertaking."  <u>See</u> 54 U.S.C. § 300320; 36 C.F.R. § 800.16(y).  As federal undertakings, they triggered the Corps' NHPA duty to consider, <u>prior</u> to the issuance of the permit, their effects on properties of cultural or historic significance.  <u>See</u> 54 U.S.C. § 306108 ("[P]rior to the issuance of any license, [the federal agency] shall take into account the effect of

the undertaking on any historic property.").  According to the Tribe, the Corps did not fulfill this

obligation because NWP 12 was issued without any tribal consultations.

      As an initial matter, the Tribe's assertion that the Corps did not engage in <u>any</u> NHPA

consultations prior to promulgating NWP 12 is false.  Before issuing NWP 12, the Corps, in

November 2009, sent an early notification to tribes, including Standing Rock, containing

information pertaining to its proposed NWPs.  <u>See</u> ECF No. 21, Exh. 14 (Letter from Ruchs to

Brings Plenty on Nov. 9, 2009).  The letter contained a graphic depiction of the types of

activities that were most often authorized by nationwide permits in the Omaha District.  <u>Id.</u>  In

addition, in 2010, the Corps proceeded to hold "listening sessions and workshops" with tribes to

discuss their concerns related to the proposed nationwide permits.  <u>See</u> ECF No. 21, Exh. 13

(Tribal Information Fact Sheet).  In March 2010, the Corps contacted Standing Rock personally

to discuss the permits and any additional regional conditions that the Tribe thought might need to

be included to protect their cultural resources.  <u>See</u> Chieply Decl., ¶ 5.

      Then, on February 10, 2011, the Corps sent a letter to the Standing Rock Sioux Tribal

Chairman and THPO Young, notifying them of its plan to publish a proposal in the Federal

Register to reissue NWP 12.  <u>See</u> ECF No. 21, Exh. 13 (Letter from Ruchs to Murphy on Feb.

10, 2011).  Attached to the letter, the Corps provided a description of the proposed NWP 12, as

well as a draft of the current Omaha District regional conditions that would apply to the permit.

<u>Id.</u>  The Corps requested that the Tribe "consider this letter our invitation to begin consultation

on the proposal to reissue the NWPs."  <u>Id.</u>  It went on to say that the Corps "look[s] forward to

consulting with you on a government-to-government basis on this issue" and requested that the

Tribe notify the Corps if it was "interested in consulting."  <u>Id.</u>  The Corps further committed to

provide a "Corps representative at consultation and fact-finding meetings" and to "fully consider

any information you wish to provide." <u>Id.</u>  In an email on March 9, 2011, the Corps followed up

on the offer.  <u>See</u> Chieply Decl., ¶ 7.  The Corps also seems to have conducted district-level

tribal listening sessions and workshops.  <u>See</u> Tribal Information Fact Sheet at 1.  There is no

indication in the record that the Tribe responded to the Corps' invitation to consult, but was

ignored.  The Tribe, in fact, concedes that it did not participate in the notice-and-comment for

NWP 12 at all.  <u>See</u> Reply at 2.  When it actually promulgated NWP 12, moreover, the Corps

included a section on its compliance with the NHPA, noting that GC 20 "requires consultation

for activities that have the <u>potential</u> to cause effects to historic properties" prior to those

activities' proceeding under the general permit.  <u>See</u> ECF No 6, Exh. 1 (Nationwide Permit 12

Decision Document) at 10 (emphasis added).

　　　To the extent that the Tribe now seeks in this Motion to launch a belated facial attack

against NWP 12, then, it is unlikely to succeed.  The Corps made a reasonable effort to discharge

its duties under the NHPA prior to promulgating NWP 12, given the nature of the general permit.

<u>Cf.</u> <u>Sierra Club v. Bostick</u>, 787 F.3d 1043, 1047, 1057 (10th Cir. 2015) (holding Corps

permissibly interpreted CWA "to allow partial deferral of minimal-impacts analysis" because of

"the difficulty of predicting the impact of activities allowed under nationwide permits").

Without definite knowledge of the specific locations that would require permitting in the future,

it is hard to ascertain what else the Corps might have done, before issuing a general permit, to

discharge its NHPA duties.  In other words, the Corps, when it promulgated NWP 12, had no

knowledge of DAPL or its proposed route.  The CWA and RHA plainly allow the Corps to do

just what it did here: preauthorize a group of similar activities that, alone and combined, have

minimal impact on navigable waterways.  This Court cannot conclude that the Corps does not

have the ability to promulgate these general permits at all.  As a result, the Corps' effort to speak with those it thought might be concerned was sufficient to discharge its NHPA obligations.

This conclusion is reinforced by the limited scale and scope of the federally sanctioned activities at issue. The Advisory Council's regulations provide that the "agency official should plan consultations appropriate to the scale of the undertaking and the scope of the Federal involvement." 36 C.F.R. § 800.4(a).  Here, the scope of the Corps' involvement was limited.  It never had the ability, after all, to regulate the entire construction of a pipeline.  Congress has decided that no general federal regulation applies to domestic oil pipelines.  In addition, the scale of the federally permitted undertaking here is narrow.  The CWA and RHA regulate, as relevant here, only certain limited construction activities in waterways.  The CWA, moreover, restricts the use of general permits to an even narrower subset of these already limited activities in waterways.  The Corps can only authorize discharges that have a <u>minimal</u> impact on the jurisdictional waterway through a general permit.  <u>See</u> 33 U.S.C. § 1344(e).  In other words, NWP 12, by definition, can authorize only that regulated conduct that will have little effect on the regulated waterway in the first place.  Given these restrictions, the Corps' decision to promulgate NWP 12 after the effort to consult that it made here was reasonable.

The Tribe responds that the Corps was instead required to work out a "programmatic agreement" with any tribe that might one day be affected by the activities permitted under NWP 12.  <u>See</u> Mot. at 22-23.  A programmatic agreement is an "agreement to govern the implementation of a particular program or the resolution of adverse effects from certain complex project situations or multiple undertakings" that is negotiated by the Advisory Council and the permitting agency.  <u>See</u> 36 C.F.R. § 800.14(b).  On this score, Standing Rock is certainly right that the Corps could have pursued a programmatic agreement to fulfill its NHPA duties, as it did

in 2004 with several tribes in regard to the Missouri Basin.  See ECF No. 6, Exh. 4

(Programmatic Agreement).  But the Advisory Council does not make the pursuit of a

programmatic agreement mandatory.  See 36 C.F.R. § 800.14(b) ("The Advisory Council and the

agency official may negotiate a programmatic agreement.") (emphasis added).  The Court thus

cannot conclude that a PA was the only avenue available to the Corps to fulfill its duties under

the NHPA.  There is, indeed, no indication that such a requirement would even be feasible for a

nationwide permitting scheme given the sheer number of possible consulting parties.  Nor could

the Corps have complied with the full Advisory Council process, which is clearly designed for

project-specific determinations.  As a result, it was reasonable for the Corps to engage in a

general process at the time it promulgated NWP 12 and to defer site-specific NHPA

determinations to a later time.

### 2.  NWP 12 Applied at Non-PCN Sites

The Tribe next argues that NWP 12's operation is unlawful because the Corps makes no

site-specific Section 106 determination for numerous generally permitted activities – i.e., non-

PCN sites.  In particular, it claims that GC 20 improperly delegates authority to the permittee to

assess whether its activities will have a potential effect on historic properties.  To refresh the

reader, GC 20 requires that "[i]n cases where the district engineer determines that the activity

may affect [NHPA] properties . . . , the activity is not authorized, until the requirements of

Section 106 of the [NHPA] have been satisfied."  77 Fed. Reg at 10,284.  The Advisory Council,

too, seems to concur that, in individual cases of permitting under NWP 12, Section 106 is not

satisfied where the Corps itself does not make a site-specific determination about whether a

permitted activity has the potential to affect historic properties.  See ECF No. 6, Exh. 50 at 1-2.

As the Tribe and the Advisory Council read GC 20, the Corps never considers whether an

individual activity will have the potential to affect historic sites unless the permittee decides that it might and, accordingly, seeks a PCN. The Corps, in turn, responds that it does consider itself to retain the authority and responsibility under GC 20 to determine whether permitted activity has the potential to damage historic properties. <u>See</u> Corps Opp. at 13-14.

Standing Rock and the Advisory Council make a good argument. It is possible that the Corps' permitting under NWP 12 would be arbitrary and capricious where it relies completely on the unilateral determination of a permittee that there is no potential cultural resource that will be injured by its permitted activity. Fortunately, this Court need not decide that issue because that is not how the Corps interpreted and applied GC 20 to DAPL. In this case, the Corps looked at reports and maps of the pipeline to determine which jurisdictional crossings had the potential to affect historic properties. <u>See</u> Chiefly Decl., Exh. 16 at 1; <u>see also</u> <u>id.</u>, Exh. 15 at 1. These extensive maps reflected cultural surveys conducted by licensed archaeologists (sometimes with SHPO participation). <u>See</u> Howard Decl., ¶¶ 4-10; <u>see, e.g.</u>, ECF No. 6, Exh. 44. The Corps ultimately concluded that only 204 of the jurisdictional crossings triggered either GC 20 or some other concern that would require a PCN verification. <u>See</u> Chiefly Decl., Exh. 16 at 1.

The Court must review that determination under the Administrative Procedure Act's deferential standard. <u>See</u> 5 U.S.C. § 706(2)(a). Under this standard, the Tribe bears the burden to demonstrate that the agency action was unlawful, arbitrary or capricious, or not in accordance with the law. <u>See</u> <u>Kleppe v. Sierra Club</u>, 427 U.S. 390, 412 (1976). Plaintiff has not done so here. At no point has the Tribe clearly pointed this Court to a specific non-PCN activity – <i>i.e.</i>, crossings the Corps permitted – where there is evidence that might indicate that cultural resources would be damaged. The Tribe instead focuses on the potential impact to cultural resources elsewhere along the pipeline. But to show the Corps' determination was unreasonable,

Standing Rock needs to offer more than vague assertions that some places in the Midwest around some bodies of water may contain some sacred sites that could be affected.  For example, if the Corps had not required a PCN verification for a site like Lake Oahe (assuming it was not subject to the RHA), to which the Tribe has shown it has important historic and cultural connections, this Court might well find unreasonable the Corps' determination that construction at the site would have no potential to cause negative effects to these resources.  Without such a specific showing involving a site within the Corps' jurisdiction, however, the Court can find no ground at this juncture to hold that the Corps' considered judgment – based as it was on its expertise, the activity involved, extensive cultural surveys, and additional research – was unreasonable.  The Tribe has had more than a year to come up with evidence that the Corps acted unreasonably in permitting even a single jurisdictional activity without a PCN, and it has not done so.  As a result, it has not met its burden here.

### 3.  *Scope of Section 106 Process at PCN Sites*

The Tribe next asserts that the Corps' Section 106 process was deficient even at those places where it did in fact require a PCN notification.  Here, again, Standing Rock largely focuses its efforts on a sweeping claim that the Corps was obligated in permitting this narrow activity – *i.e.*, certain construction activities in U.S. waterways – to consider the impact on potential cultural resources from the construction of the entire pipeline.  In particular, the Tribe contends that the NHPA requires such an analysis because the statute defines the potential effect of an undertaking to include the indirect effects of the permitted activity on historic properties.

This argument, however, misses the mark.  In its regulations concerning compliance with the adverse-effects analysis required by the NHPA, the Corps determined that entire pipelines need not be considered part of the analyzed areas.  Rather, only construction activity in the

federally regulated waterways – the direct effect of the undertaking – and in uplands around the federally regulated waterways – the indirect effect of the undertaking – requires analysis.  See 33 C.F.R. pt. 325, app. C, § 1(g)(i).  This Circuit has held just such an approach to be reasonable in the context of a challenge brought under a similar "stop, look, and listen" provision in NEPA, and these two statutes are often treated similarly.  See, e.g., Karst Envtl. Educ. & Prot., Inc. v. EPA, 475 F.3d 1291, 1294-95 (D.C. Cir. 2007) ("Because of the 'operational similarity' between NEPA and NHPA, both of which impose procedural obligations on federal agencies after a certain threshold of federal involvement, courts treat 'major federal actions' under NEPA similarly to 'federal undertakings' under NHPA.").  Specifically, this Circuit held that where a federal easement and CWA permitting encompassed only five percent of the length of a pipeline, "the federal government was not required to conduct NEPA analysis of the entirety of the . . . pipeline, including portions not subject to federal control or permitting."  Sierra Club v. U.S. Army Corps of Eng'rs, 803 F.3d 31, 34-35 (D.C. Cir. 2015).  Other Circuits have held the same. See Bostick, 787 F.3d at 1051-54 (holding Corps was not required to prepare NEPA analysis of entire pipeline when verifying NWPs for 485-mile oil pipeline crossing over 2,000 waterways); Winnebago Tribe of Neb. v. Ray, 621 F.2d 269, 272-73 (8th Cir. 1980) (concluding same for electric utility line).  The Tribe offers no persuasive argument as to why the facts here demand a different conclusion.  As a result, this Court cannot conclude here that a federal agency with limited jurisdiction over specific activities related to a pipeline is required to consider all the effects of the entire pipeline to be the indirectly or directly foreseeable effects of the narrower permitted activity.

The Corps' decision in this regard is also entitled to deference under the APA as it falls squarely within the expertise of the Corps, not the Advisory Council, to determine the scope of

the effects of construction activities at U.S. waterways.  See Bldg. & Constr. Trades Dep't v. Brock, 838 F.2d 1258, 1266 (D.C. Cir. 1988) (holding courts must be especially deferential to an agency's determination within an area in which it has "special expertise").  The Tribe, moreover, fails to provide any evidence that would call the Corps' technical judgment in this regard into question.  See 33 C.F.R. pt. 325, app. C, § 1(g)(i) (explaining that for linear crossings, the "permit area shall extend in either direction from the crossing to that point at which alternative alignments leading to a reasonable alternative locations for the crossing can be considered and evaluated").  The Tribe contends instead, without evidence, that the entire pipeline must be the indirect effect of the permitted activity because the pipeline cannot feasibly avoid all federally regulated water crossings.  In other words, no permitting means no pipeline.  The Court cannot say on this record, however, that the Tribe is right.  In fact, as DAPL's own construction demonstrates, the use of technology such as HDD can at least sometimes avoid the Corps' jurisdiction at federally regulated waters by eliminating the need for the discharge of dredge or fill material.

The limited nature of the Corps' jurisdiction, in fact, reinforces the reasonableness of the its decision not to consider the effects of the entire pipeline on historic properties before issuing the DAPL permitting.  "[W]here an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions, the agency['s action] cannot be considered a legally relevant 'cause' of the effect."  Dep't of Transp. v. Public Citizen, 541 U.S. 752, 770 (2004).  Section 106 analysis is designed only to "discourage[e] federal agencies from ignoring preservation values in projects they initiate, approve funds for or otherwise control."  Lee v. Thornburgh, 877 F.2d 1053, 1056 (D.C. Cir. 1989).  That section does not require that the Corps consider the effects of actions over which it has no control and which are far removed from its

permitting activity.  The Corps here ultimately determined that the route taken by the pipeline through private lands, up to a certain point approaching a federally regulated waterway, is driven by factors that have little to do with the discrete activities that the Corps needs to permit.  The Court cannot conclude otherwise on this record.  As such, it cannot hold the Corps' decision arbitrary, capricious, or otherwise unlawful.

### 4.  *Sufficiency of Consultations*

Plaintiff's last point on the merits is that the Corps failed to offer it a reasonable opportunity to participate in the Section 106 process as to the narrow scope of the construction activity that the Corps did consider to be an effect of the permitted waterway activities.  The factual proceedings recited in exhaustive detail in Section I.D., *supra*, tell a different story.  The Corps has documented dozens of attempts to engage Standing Rock in consultations to identify historical resources at Lake Oahe and other PCN crossings.  To the reader's relief, the Court need not repeat them here.  Suffice it to say that the Tribe largely refused to engage in consultations.  It chose instead to hold out for more – namely, the chance to conduct its own cultural surveys over the entire length of the pipeline.

In fact, on this record, it appears that the Corps exceeded its NHPA obligations at many of the PCN sites.  For example, in response to the Tribe's concerns about burial sites at the James River crossing, the Corps verified that cultural resources indeed were present and instructed Dakota Access to move the pipeline to avoid them.  Dakota Access did so.  See Ames Decl., ¶ 24.  Furthermore, the Corps took numerous trips to Lake Oahe with members of the Tribe to identify sites of cultural significance.  See Summit Lake Paiute Tribe of Nevada v. U.S. Bureau of Land Mgmt., 496 F. App'x 712, 715 (9th Cir. 2012) (not reported) (holding four visits with a tribe to site constituted sufficient consultation for resolution of adverse effects).  Colonel

Henderson also met with the Tribe no fewer than four times in the spring of 2016 to discuss their concerns with the pipeline.  Ultimately, the Corps concluded that no sites would be affected by the DAPL construction at Lake Oahe, and the State Historic Preservation Officer who had visited that site concurred.  The Corps' effort to consult the Tribe on this site – the place that most clearly implicated the Standing Rock Sioux's cultural interests – sufficed under the NHPA.

Contact, of course, is not consultation, and "consultation with one tribe doesn't relieve the [agency] of its obligation to consult with any other tribe."  Quechan Tribe of Fort Yuma Indian Reservation v. U.S. Dep't of Interior, 755 F. Supp. 2d 1104, 1112, 1118 (S.D. Cal. 2010). But this is not a case about empty gestures.  As noted in Section I.D., *supra*, and the examples just above, the Corps and the Tribe engaged in meaningful exchanges that in some cases resulted in concrete changes to the pipeline's route.  "This is not a case like Quechan Tribe, where a tribe entitled to consultation actively sought to consult with an agency and was not afforded the opportunity."  Wilderness Soc'y. v. Bureau of Land Mgmt., 526 F. App'x 790, 793 (9th Cir. May 28, 2013) (not reported).

The Tribe nevertheless asserts that the Corps' failure to include it in the early cultural surveys rendered the permitting unlawful for at least some of the PCN sites.  These surveys, however, were not conducted by the Corps or under its direction.  Even setting this fact aside, neither the NHPA nor the Advisory Council regulations require that any cultural surveys be conducted for a federal undertaking.  The regulations instead demand only that the Corps make a "reasonable and good faith effort" to consult on identifying cultural properties, which "may include background research, consultation, oral history interviews, sample field investigations, and field survey."  36 C.F.R. § 800.4(b)(1).  It goes without saying that "'may' means may." McCreary v. Offner, 172 F.3d 76, 83 (D.C. Cir. 1999).  These regulations contain "no

requirement that a good faith effort include <u>all</u> of these things." <u>Summit Lake Paiute</u>, 496 F.

App'x at 715. The Tribe, then, did not have an absolute right to participate in cultural surveying

at every permitted undertaking, as it seems to argue. The Advisory Council regulations direct

the agency to "take into account past planning, research, and studies" in making these types of

determinations, <u>see</u> 36 C.F.R. § 800.4(b)(1), and that is just what the Corps did here. It gave the

Tribe a reasonable and good-faith opportunity to identify sites of importance to it. As a result,

the Court must conclude that the Tribe has not shown that it is likely to succeed on the merits of

its NHPA claim at this stage.

     B. <u>Irreparable Injury</u>

     In seeking preliminary-injunctive relief here, the Standing Rock Sioux do <u>not</u> claim that a

potential future rupture in the pipeline could damage their reserved land or water. Instead, they

point to an entirely separate injury: the likelihood that DAPL's ongoing construction activities –

specifically, grading and clearing of land – might damage or destroy sites of great cultural or

historical significance to the Tribe. The risk that harm might befall such sites is a matter of

unquestionable importance to the Standing Rock people. In the eloquent words of their Tribal

Chairman:

> History connects the dots of our identity, and our identity was all but
> obliterated. Our land was taken, our language was forbidden. Our
> stories, our history, were almost forgotten. What land, language, and
> identity remains is derived from our cultural and historic sites. . . .
> Sites of cultural and historic significance are important to us because
> they are a spiritual connection to our ancestors. Even if we do not
> have access to all such sites, their existence perpetuates the
> connection. When such a site is destroyed, the connection is lost.

Archambault Decl., ¶¶ 6, 15. The tragic history of the Great Sioux Nation's repeated

dispossessions at the hands of a hungry and expanding early America is well known. <u>See, e.g.</u>,

Dee Brown, <u>Bury My Heart at Wounded Knee</u> (1970); <u>United States v. Sioux Nation</u>, 448 U.S.

371 (1980).  The threat that new injury will compound old necessarily compels great caution and respect from this Court in considering the Tribe's plea for intervention.

Although the potential injury may be significant, the Tribe must show that it is <u>probable</u> to occur in the absence of the preliminary injunction it now seeks.  <u>See</u> <u>Winter</u>, 555 U.S. at 22 ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a <u>clear showing</u> that the plaintiff is entitled to such relief.") (emphasis added). This is the burden the law imposes for this form of relief.  The Court must faithfully and fairly apply that standard in all cases, regardless of how high the stakes or how worthy the cause.  After a careful review of the current record, the Court cannot conclude that the Tribe has met it.

To understand Standing Rock's deficit in this regard, it is necessary to first consider the nature of the relief it seeks.  The Tribe has not sued <u>Dakota Access</u> here for any transgressions; instead, this Motion seeks to enjoin <u>Corps permitting</u> of construction activities in discrete U.S. waterways along the pipeline route.  Such relief sought cannot stop the construction of DAPL on private lands, which are not subject to any federal law.  Indeed, Standing Rock does not point the Court to any law violated by the private contracts that allow for this construction or any federal regulation or oversight of these activities.  From the outset, consequently, no federal agency had the ability to prevent DAPL's construction from proceeding on these private lands.  At most, the Corps could only have stopped these activities at the banks of a navigable U.S. waterway.  An injunction of any unlawful permitting now can, at most, do the same.

The facts previously recited bear this simple conclusion out.  Dakota Access, as has been explained, began its construction work on private lands long before it had even secured the Corps permitting that the Tribe now seeks to enjoin.  <u>See</u> Mahmoud Decl., ¶ 47.  Standing Rock

concedes as much.  See Mot. at 35; see also Mot. Hearing Tran. at 46 ("They started construction

months ago, months before the permits were issued.").  In many places, this work is already

complete.  See Mot. Hearing Trans. at 24.  There is, moreover, no sign that Dakota Access will

pull back from this construction on private land if this Court enjoins the NWP 12 permitting

necessary for the 3% of DAPL's route subject to federal jurisdiction.  Quite the contrary; the

company has indicated that it has little choice but to push ahead in the hopes of meeting contract

obligations to deliver oil by January 2017.  See, e.g., id. at 40-41; see also Mahmoud Decl., ¶ 51.

The Tribe thus cannot demonstrate that the temporary relief it seeks here – i.e., a

preliminary injunction to withdraw permitting by the Corps for dredge or fill activities in

federally regulated waters along the DAPL route – can prevent the harm to cultural sites that

might occur from this construction on private lands.  In other words, Standing Rock cannot show

that any harm taking place on private lands removed from the Corps' permitting jurisdiction

"will directly result from the action which [it now] seeks to enjoin."  Hunter v. FERC, 527 F.

Supp. 2d 9, 14-15 (D.D.C. 2007) (explaining that to obtain preliminary relief, "the movant must .

. . show that 'the alleged harm will directly result from the action which the movant seeks to

enjoin'") (quoting Wisc. Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985) (emphasis

added)); see also Buckingham Corp. v. Karp, 762 F.2d 257, 261 (2d Cir. 1985) ("The purpose of

a preliminary injunction is to protect the moving party from irreparable injury during the

pendency of the action.").  Powerless to prevent these harms given the current posture of the

case, the Court cannot consider them likely to occur in the absence of the relief sought here.  Put

simply, any such harms are destined to ensue whether or not the Court grants the injunction the

Tribe desires.  As Standing Rock acknowledges, Dakota Access has demonstrated that it is

determined to build its pipeline right up to the water's edge regardless of whether it has secured a

permit to then build across.  See Mot. Hearing Trans. at 46.  Like the Corps, this Court is unable to stop it from doing so.

There is a second related problem with the Tribe's claim to irreparable injury, both on the private land and elsewhere along the pipeline.  The risk that construction may damage or destroy cultural resources is now moot for the 48% of the pipeline that has already been completed.  Id. at 24.  As the clearing and grading are the "clearest and most obvious" cause of the harm to cultural sites from pipeline construction, id. at 18-19, 47 (recognizing that injunction is necessary anywhere not yet cleared "to prevent additional harm or construction until [cultural] surveys can take place"), moreover, the damage has already occurred for the vast majority of the pipeline, with the notable exception of 10% of the route in North Dakota, including at Lake Oahe.  Here again, then, the Tribe has not shown for this substantial segment of the pipeline that any additional harm is likely to occur to cultural sites absent the preliminary injunction that it now seeks.

Yet a third problem bedevils the Tribe's efforts to enjoin permitting along the entire pipeline route.  Plaintiff never defined the boundaries of its ancestral lands *vis-à-vis* DAPL. Instead, Standing Rock asserts that these lands extend "wherever the buffalo roamed."  Even accepting this is true, to find that there is a likelihood that construction might run afoul of a site of cultural significance to the Tribe, this Court must ultimately decide where those culturally significant lands lie.  There is at least some evidence in the record that they do not traverse the entirety of DAPL.  For example, Jon Eagle, the Tribe's current THPO, indicated prior to this litigation that at least some of the pipeline did not fall within the scope of what he considered ancestral tribal lands.  See Chiefly Decl., Exh. 14 (Letter from Jon Eagle to Martha Chiefly on Mar. 22, 2016) ("Most of the DAPL pipeline route crosses Lakota/Dakota aboriginal land."); see

<u>also</u> ECF No. 11-7 (Declaration of H. Frazier).  This Court may not enjoin an action that the

Corps has authorized by guessing at whether an interest of the Tribe might be affected.  Instead,

Plaintiff bears the burden to demonstrate that the permitting it seeks to have withdrawn would, in

the absence of such relief, likely cause it harm.  This it did not do for much of the pipeline.

 So what activity remains subject to this Court's injunctive powers?  Any <u>permitted</u> DAPL

activity that the Tribe has shown will likely injure a nearby site of cultural or historic

significance to the Standing Rock people.  As previously explained, 204 sites were subject to

PCN authorizations and thus were clearly permitted by the Corps.  Those sites are in play.  Other

discharges into jurisdictional waters at hypothetical locations along the route, however, may also

have been permitted under NWP 12 without a PCN process.  But it would be pure speculation

based on the current record to determine where such permitting occurred.  The Tribe points the

Court to no specific crossing of cultural significance that the Corps permitted under NWP 12

without a PCN verification.  In fact, many of the pipeline crossings were not permitted by the

Corps, sometimes because Dakota Access's use of HDD did not give rise to the dredge or fill

activities that trigger federal jurisdiction under the CWA.  For example, out of the five places in

North Dakota that Dakota Access thought might require a PCN authorization, only three actually

needed permitting at all.  <u>See</u> Chiefly Decl., ¶ 10.  Of course, there may be many sites that the

Corps permitted under NWP 12 that the Court has missed.  But the burden is on the Tribe to

indicate why this permitting must be enjoined to prevent an injury likely to occur to it. The

Court, again, cannot guess that at some undefined locations there might be harm to the Tribe.  It

was Standing Rock's burden to point to the specific NWP 12 permitting that was likely to cause

it injury. Standing Rock did not do so with regard to the permitting that has occurred outside of the PCN verified locations.

Returning to the 204 PCN sites, the vast majority must be excluded right off the bat. As previously noted, construction at 193 of the 204 PCN has already been completed. See Mot. Hearing Trans. at 24. For those sites, the die is cast. Whatever harms may have occurred from DAPL construction, the Court's intervention to enjoin the permitting now can no longer avoid them. As a result, the Court must deny the Tribe's request for an injunction as to permitting at those sites.

As to the other 11 PCN sites, the Tribe largely neglects to point the Court to any resources that may be affected by permitted activity. Plaintiff seeks to avoid its responsibility to identify a likely injury at these locations by claiming that this failure stems from the Corps' refusal to properly consult in the first place and thus should be excused. See Mot. at 37 n.17. At least with regard to some of these sites, however, the Corps did offer the Tribe the opportunity to visit the sites or even conduct its own surveys, and the Tribe declined to do so. See Chiefly Decl., ¶¶ 28-29. The record contains abundant evidence that the Corps also repeatedly sought other input on known cultural sites at these locations, and, in many cases, other tribes conducted site visits to search for any resources likely to be affected by the DAPL work. Id. The Tribe cannot now ask the Court to speculate that there would be a likely injury at these places by claiming that it was prevented from assessing these sites.

These sites are also subject to several additional restrictions that make it unlikely that construction will damage or destroy sites of cultural significance to the Tribe. First, the Corps attached restrictions to its PCN authorizations. These restrictions mandate that tribal monitors and archaeologists be allowed at these sites to look for any evidence of previously overlooked

resources whenever construction is happening.  See ECF No. 6, Exhs. 33-36 (PCN

authorizations).  GC 21 will also require that Dakota Access stop work until any unanticipated

discovery can be evaluated for its historic and cultural significance by the Corps and the SHPO.

See NWP 12 at 10,184.  Standing Rock, too, will have the right to be involved in that verification

process.  Id.  Given all these precautions, and the Tribe's failure to point the Court toward any

evidence that a particular resource will be injured by this work, the Court must conclude that

Plaintiff has not met its burden to show that irreparable injury is likely to occur without an

injunction against this permitting.

And then there was one: Lake Oahe.  This is the sole permitting that the Tribe might

arguably show is likely to cause harm to cultural or historic sites of significance to it.  As

previously discussed, Lake Oahe is of undeniable importance to the Tribe, and the general area is

demonstrably home to important cultural resources.  Even here, though, the Tribe has not met its

burden to show that DAPL-related work is likely to cause damage.  The Corps and the Tribe

conducted multiple visits to the area earlier this year in an effort to identify sites that might be

harmed by DAPL's construction.  See Eagle Decl., ¶¶ 13-14; Harnois Decl., ¶ 29.  While the

Tribe identified several previously undiscovered resources during those visits, these sites are

located away from the activity required for the DAPL construction.  See Harnois Decl., ¶ 29.

Ultimately, the Corps considered these findings and determined that they would not be affected

by the permitted activity.  Id., ¶ 33.  Most importantly, the North Dakota SHPO concurred in this

opinion after having toured the site as well.  See Harnois Decl., ¶ 34.

Several factors unique to the site also support this conclusion.  The area around the

permitted activity has been subject to previous surveying for other utility projects.  See

Mahmoud Decl., ¶¶ 18-19.  DAPL likewise will run parallel, at a distance of 22 to 300 feet, to an

already-existing natural-gas pipeline under the lake. Id.; see also Mot. Hearing Tran. at 25. Dakota Access will also use the less-invasive HDD method to run the pipeline, which will require less disturbance to the land around the drilling and bury the pipeline at a depth that is unlikely to damage cultural resources. See Howard Decl., ¶ 7; see also Mahmoud Decl., ¶ 19. Indeed, the Corps concluded that this method would not cause structural impacts at sites away from the direct drilling, and the Tribe presents no evidence to the contrary. See ECF No. 6, Exh. 51 (Omaha District Envtl. Assessment) at 78-79. Any temporary disturbance to the atmospherics around the site, moreover, will not be irreparable as they will be removed once the construction is complete. Finally, like the other PCN sites, there are several protective measures in place to assure that the Tribe and others will be able to monitor the construction activity to protect any previously unidentified resources.

For all of the above reasons, the Tribe has not carried its burden to demonstrate that the Court could prevent damage to important cultural resources by enjoining the Corps' DAPL-related permitting.

**IV.    Conclusion**

As it has previously mentioned, this Court does not lightly countenance any depredation of lands that hold significance to the Standing Rock Sioux.  Aware of the indignities visited upon the Tribe over the last centuries, the Court scrutinizes the permitting process here with particular care.  Having done so, the Court must nonetheless conclude that the Tribe has not demonstrated that an injunction is warranted here.  The Court, therefore, will issue a contemporaneous Order denying the Plaintiffs' Motion for Preliminary Injunction.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  September 9, 2016